IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| NEBRASKA HABITAT CONSERVATION COALITION, | ) ) ) | |
| Plaintiff, | ) ) | 4:03CV3059 |
| v. | ) ) ) | |
| UNITED STATES FISH AND WILDLIFE SERVICE, an Agency of the United States Department of the Interior; GALE NORTON, Secretary of the Interior, STEVEN WILLIAMS, Director of the U.S. Fish and Wildlife Service, | ) ) ) ) ) ) ) ) ) | MEMORANDUM OPINION |
| Defendants, | ) ) | |
| _____ | ) | |
| DEFENDERS OF WILDLIFE; CENTER FOR BIOLOGICAL DIVERSITY; and THE CONSERVATION ALLIANCE OF THE GREAT PLAINS, | ) ) ) ) ) | |
| Intervening Defendants. | ) ) | |
| _____ | ) | |

This matter is before the Court on plaintiff Nebraska Habitat Conservation Coalition's ("NHCC" or "plaintiff") motion for summary judgment (Filing No. 41), defendants' cross motion for summary judgment (Filing No. 47) and intervening defendants' motion for summary judgment (Filing No. 49).  The Court has reviewed the parties' cross motions for summary judgment, the oppositions and replies thereto, and the administrative record, and makes the following findings.

## I. Background

This case concerns the piping plover, a small, sand-colored bird, and the designation of its critical habitat under the Endangered Species Act.  Defendants, the United States

Fish and Wildlife Service, its director, Steven Williams and Secretary for the Interior Gail Norton (collectively "FWS"), designated the Platte River from Lexington, Nebraska, to its confluence with the Missouri River as critical habitat for the plover.  Also designated as plover critical habitat were stretches of the Niobrara and Loup Rivers in Nebraska and a stretch of the Missouri River bordering Nebraska.

Plaintiff, a nonprofit coalition of Nebraska political subdivisions and associations of interested parties, challenge numerous aspects of the Service's designation.

## A.   ESA, NEPA, and Designation of Critical Habitat

Enacted in 1973, the Endangered Species Act ("ESA"), is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 98 S. Ct. 2279 (1978).  An endangered species is a species that is "in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6), while a threatened species is a species that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).  Congress conferred partial responsibility for implementing the ESA on the Secretary of the Interior, who, in turn conferred her responsibilities to FWS.  16 U.S.C. § 1532(15).

The ESA authorizes FWS to protect a species by listing it as threatened or endangered and then requires FWS to designate

-2-

those lands that are essential to its conservation as that species' critical habitat ("CH"). 16 U.S.C. §§ 1532-1533. While determinations as to whether or not a species is endangered or threatened must be made "solely on the basis of the best scientific and commercial data available," designation of CH additionally requires consideration of economic and other impacts. 16 U.S.C. § 1533(b)(1)-(2).

A CH designation provides protection for threatened and endangered species by triggering a Section 7 consultation in response to actions proposed by or with a nexus to a federal agency. 16 U.S.C. § 1536(a)(2). Section 7(a)(2) of the ESA requires each federal agency, in consultation with FWS, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . which is . . . critical." *Id.* A FWS regulation defines "jeopardize" as "an action that reasonably would be expected . . . to reduce appreciably the likelihood of both the survival and recovery of a listed species." 50 C.F.R. § 402.02. The same regulation defines "destruction or adverse modification" as an "alteration that appreciably diminishes the value of CH for both the survival and recovery of a listed species." *Id.*

If an agency action may adversely affect a listed species' CH, the action agency and the FWS enter into a formal

-3-

consultation process, at the conclusion of which the FWS issues a biological opinion as to the effect of the federal agency action. If the FWS concludes that the action will likely result in adverse modification of CH, the FWS shall set forth any reasonable and prudent alternatives to the action. *See* 50 C.F.R. § 402.14; 16 U.S.C. § 1536(b)(3)(A).

The National Environmental Policy Act ("NEPA"), a statute separate from the ESA, requires federal agencies to examine the environmental effects of proposed federal actions and to inform the public of the environmental concerns that went into the agency's decision-making. *See Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97, 103 S. Ct. 2246 (1983). Specifically, NEPA requires, "to the fullest extent possible," all agencies of the federal government to prepare environment impact statements for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

## B.   FWS's Designation

On September 11, 2002, FWS published a final rule in the Federal Register that designates as piping plover CH, 19 CH units encompassing approximately 183,422 acres and portions of four (4) rivers totaling approximately 1,207.5 river miles in the states of Minnesota, Montana, Nebraska, North Dakota and South Dakota. Administrative Record ("AR") 1972, 1973 (Critical Habitat Designation for Northern Great Plains Piping Plover, *67 Fed. Reg. 57,638* (Sept. 11, 2002)).

-4-

The 2002 designation came nearly 17 years after FWS published its final rule pursuant to the ESA listing the plover as endangered in the Great Lakes watershed and threatened in the remainder of its range.  AR 1972, 1976 (*citing* Determination of Endangered and Threatened Status for the Piping Plover, *50 Fed. Reg. 50,726* (Dec. 11, 1985)).  Back in 1985, the FWS declined to designate any CH for the plover.  In 1996, the Defenders of Wildlife filed suit to compel CH designation for the Great Lakes and Northern Great Plains populations of piping plovers.  In 2000, a court ordered FWS to carry out these designations.  AR 1972, 1977 (*citing Defenders of Wildlife and Piping Plover v. Babbitt*, Nos. 96-CV-2695, 97-CV-777 (D.D.C Feb. 7, 2000)).

In Nebraska, FWS designated the Platte River, from Lexington, Nebraska, to its confluence with the Missouri River, a stretch of 252 linear miles; a 68-mile stretch of the Loup River, a 120-mile stretch of the Niobrara River and a 120-mile stretch of the Missouri River bordering Nebraska as CH.  AR 1972, 1984 (*67 Fed. Reg. 57,649* (Sept. 11, 2002)).  FWS considered all areas designated as CH to be occupied.  AR 1806.

## C.   Plaintiff's Interests

NHCC represents diverse organizations including natural resources districts, public power districts, irrigation districts, political subdivisions and other associations of interested parties such as the Nebraska Farm Bureau.  NHCC's members have a vested interest in water use in Nebraska especially in regard to conservation, agricultural usage, power

-5-

production and the responsibility for management of water resources in Nebraska.

Through comments responding to the proposed designation of piping plover CH in Nebraska, FWS was made aware of plaintiff's concerns that designation would have adverse effects for its members.  Plaintiff submitted 41 single-spaced pages of comments to FWS detailing its concerns.  AR 11577-11601, 12315-12330.

## II.  Standing

Defendants and intervenors question whether plaintiff has standing to bring this suit.  To establish standing, plaintiff must show that it meets certain constitutional and prudential requirements.

Article III of the Constitution requires a "concrete and particularized injury" that is "(1) actual or imminent, (2) caused by, or fairly traceable to an act challenged in the instant litigation, and (3) redressable by the court."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130 (1992); *Shain v. Veneman*, 376 F.3d 815, 817 (8th Cir. 2004).

Plaintiff claims injury related to the FWS's alleged failure to follow statutory dictates in designating CH for the piping plover.  Plaintiff asserts that the designation of CH will adversely impact water use in the State of Nebraska, including water use for irrigation, agriculture, conservation activities and power generation.  AR 1-112 at 1990.  Specifically, two members of the plaintiff coalition, Nebraska Public Power

-6-

District ("NPPD") and Central Nebraska Public Power Irrigation District ("CNPPID"), have already incurred significant economic impacts due to consultation related to plovers and other listed species.  AR 4-2386 at 12322-12323.  FWS admits that the direct costs of consultations will increase due to the designation of CH because of the increased time and complexity necessitated by the CH designation.  AR 1-53 at 212.

Plaintiff has alleged injuries which are actual or imminent.  These injuries are causally related to FWS's designation of CH in Nebraska, which is the subject of this litigation.  In addition, as a result of this litigation, this Court could require FWS to revisit its designation of CH.  Where litigation challenges the legality of governmental action and where the plaintiff is an object of the governmental action, there is little question that a judgment preventing or requiring the action will redress it.  *The Cape Hattaras Access Pres. Alliance v. U.S. Dept. of the Interior*, 344 F. Supp.2d 108, 118 (D.D.C. 2004).  Therefore, plaintiff has demonstrated constitutional standing under Article III.

### III.   STANDARD OF REVIEW

FWS's designation of piping plover CH in Nebraska is reviewed pursuant to the standard in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; *N. M. Cattle Growers Ass'n v. Fish & Wildlife Serv.*, 248 F.3d 1277, 1281 (10th Cir. 2001)(challenge to merits of critical habitat designation reviewed under the APA); *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir.

-7-

2004).  Under this standard, a court may set the action aside only if FWS's decision was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law.  *Id.*  In making this inquiry, the Court asks whether FWS considered the relevant factors and whether or not it made a clear error of judgment.  "Whether an agency's action is arbitrary and capricious depends on whether 'the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Mausolf v. Babbitt*, 125 F.3d 661, 669 (8th Cir. 1997)(*quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto.* Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856 (1983)), cert. denied, 118 S. Ct. 2366 (1998).  Rather, the agency action under review is entitled to a high degree of deference.  *Vue v. INS*, 92 F.3d 696, 699 (8th Cir. 1996).  The burden of proof under the arbitrary and capricious standard is on the party challenging the decision.  *See United States v. Massey*, 380 F.3d 437, 440 (8th Cir. 2004).

The Court must review FWS's designation based on the administrative record before the court.  *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S. Ct. 1241 (1973).  Because there are generally no facts in dispute in administrative record cases, and the Court need not and, indeed, may not, "find" underlying facts, there are no material facts essential to the Court's resolution of this action, and the parties' motions for summary judgment are

-8-

appropriate.  *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986).

## IV. Analysis

### A.   Critical Habitat Designation

Under the ESA, CH may include "specific areas within the geographical area occupied by the species . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection."  16 U.S.C. § 1532(5)(A)(i).  Here, FWS has designated that the CH for the Nebraska rivers "include all areas between the banks" of the rivers.  Furthermore, FWS has stated that all areas in Nebraska designated as plover critical habitat are occupied.  AR 1806.

### 1.  FWS's Definition of "Occupied"

An agency interpreting a statute it administers gets *Chevron* deference.  *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 842, 104 S. Ct. 2778 (1984).  If the statute clearly addresses the precise question at issue, that ends the matter.  If, on the other hand, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id*.

The ESA does not define "occupied" or "geographical area occupied by the species."  Thus, under *Chevron*, the question becomes whether FWS's definition is permissible.  FWS does not have a regulation that imposes a single definition of "occupied"

-9-

for all species; rather, FWS has retained flexibility and defines the term differently depending on a given species' characteristics. FWS's final rule for the plover does not explicitly define "occupied," yet the rule makes clear that, to be considered occupied, it is necessary that "the [piping plover] is known to be present in the CH area." AR 1996. A river segment designated as CH would be considered occupied when [plovers] were using sandbars anywhere in the reach." AR 1996. FWS looked for areas with "consistent use," which the service defined for the Nebraska rivers as those areas where "piping plover nesting has been consistently documented since listing." AR 1981 (67 Fed. Reg. 57,638, 57,646). This is a reasonable and permissible definition of "occupied" and the Court defers to FWS's expertise on this issue. *See Cape Hatteras,* 344 F. Supp.2d at 120.

    2.   The Application of the Definition

Next, plaintiff challenges FWS's application of its definition of "occupied" in this case, and contests the validity of survey data cited by FWS. First, plaintiff argues that extensive stretches of the Platte River cannot be considered "occupied" because on average only one nest per year was located on natural habitat over the 148-mile stretch of the central Platte River (Plaintiff's Responsive Brief, p.22 n.7). Furthermore, plovers did not nest on natural habitat every year along the central Platte River. One survey noted plover nesting in only five out of ten years with no nesting on natural habitat

since 1996 along the entire 148-mile stretch of the central
Platte River.  AR 10169-10170.  The lack of plover occupation on
the central Platte is further evidenced by the fact that no
plover chicks were fledged in the entire decade of the 1990's on
this stretch of the river.  AR 15341-15342.  With no plover
nesting on natural habitat since 1996 and no chicks fledged in
the decade of the 1990's, FWS is mistaken in defining this
stretch of the river as occupied because it lacks the consistent
use that FWS says that it looks for in finding an area to be
"occupied."

**B.   Primary Constituent Elements**

Even if the FWS had correctly determined that the
plover occupied the designated critical habitat area, the FWS
must also determine that "those physical or biological features
(I) essential to the conservation of the species and (II) which
may require special management considerations or protection" are
"found" on specific areas within that area.  16 U.S.C.
§ 1532(5)(A)(i).  In the FWS's parlance, such features that
satisfy the Act's requirements are Primary Constituent Elements
("PCE's").  *See* 50 C.F.R. § 424.12(b)(5).  FWS regulations guide
PCE selection:

> the Secretary shall focus on the
> principal biological or physical
> constituent elements within the
> defined area that are essential to
> the conservation of the species.
> Known primary constituent elements
> shall be listed with the critical
> habitat description.  Primary
> constituent elements may include,
> but are not limited to, the

-11-

> following:  roost sites, nesting
> grounds, spawning sites, feeding
> sites, seasonal wetland or dryland,
> water quality or quantity, host
> species or plant pollinator,
> geological formation, vegetation
> type, tide, and specific soil
> types.

*Id.*  FWS states that the piping plover PCE for rivers such as the

Platte, Niobrara and Loup is "the dynamic ecological processes

that create and maintain piping plover habitat."  AR at 57643.

These dynamic ecological processes are those that produce

"sparsely vegetated channel sandbars, sand and gravel beaches on

islands, temporary pools on sandbars and islands and the

interface with the river."  AR at 57643.

Plaintiff argues that FWS's choice of PCE's is

deficient because the PCE's were not "found" in the designated

areas.  PCE's must be "found" on occupied land before that land

can be eligible for designation as CH.  16 U.S.C.

§ 1532(5)(A)(i); *Cape Hattaras*, 344 F. Supp. 2d at 122; *Home

Builders Ass'n of N. Cal. v. Fish & Wildlife Serv.*, 268 F. Supp.

2d 1197, 1214 (E.D. Cal. 2003).  In its published final rule, FWS

states that "[b]oth the definition of [CH] in the ESA and the

implementing regulations indicate that [CH] is a specific

geographic area(s) that is essential for the conservation of a

threatened or endangered species. . . ."  AR 1992.  Only areas

*currently known* to be essential are to be designated and

essential areas should already have the necessary PCE's.  AR

1977(emphasis added)("Within the geographic area presently

occupied by the species, we will not designate areas that do not

-12-

have [PCE's]."). Nevertheless, FWS states that "some areas *not essential* to conservation of the piping plover were included within CH boundaries" that are not CH. AR 1992 (emphasis added). Not only does FWS admit to including nonessential areas within its CH designation, FWS also admits that "[w]e did not map [CH] with sufficient detail to exclude all developed areas such as mainstem dam structures, buildings, marinas, boat ramps, bank stabilization and breakwater structures, row cropped or plowed agricultural areas, mines, roads or other lands (e.g., high bank bluffs along the Missouri River reservoirs) unlikely to contain [PCE's] essential for northern Great Plains piping plover conservation. These features will not contain one or more of the [PCE's]." AR 1793. Thus, by its own admissions, FWS has designated areas as CH that lack PCE's. Areas that lack PCE's are ineligible for CH designation.

In the administrative record, FWS offers as excuses court-ordered time constraints, budgetary and staffing constraints, as well as the highly dynamic nature of the piping plover habitat. AR 1983. As other courts have previously held, these excuses have no basis in the statute or in cases; rather, FWS has previously been critiqued for failing to mount the proper effort to ensure that PCE's do exist on designated lands. *See Cape Hatteras*, 344 F. Supp. 2d at 122; *Home Builders*, 268 F. Supp. 2d at 1214-16. When confronted with these well-reasoned decisions from other courts, FWS fails to distinguish the cases, but simply expresses its disagreement with the results. FWS's

-13-

unsubstantiated disagreement with these cases is insufficient to convince the Court to disregard these persuasive, though not binding, decisions.  Thus, the excuses put forth by FWS do not absolve FWS from its responsibility to appropriately designate CH in accordance with the applicable statutes and regulations. Therefore, the Court will vacate FWS's Critical Habitat Designation for the Northern Great Plains Piping Plover, 67 Fed. Reg. 57,638 (Sept. 11, 2002) and remand to FWS for redesignation of CH so as to include only areas occupied by the piping plover where PCE's are found, in Nebraska and on the Missouri River adjacent to Nebraska.

## C.    Definiteness of Boundaries

Next, the parties dispute whether FWS has followed its own regulation setting forth how to define the bounds of critical habitat areas.  This issue has previously been addressed in *Cape Hatteras*.  The regulation reads:

> Each critical habitat will be defined by specific limits using reference points and lines as found on standard topographic maps of the area.  Each area will be referenced to the State(s), county(ies), or other local governmental units within which all or part of the critical habitat is located. Unless otherwise indicated within the critical habitat descriptions, the names of the State(s) and county(ies) are provided for information only and do not constitute the boundaries of the area.  Ephemeral reference points (e.g., trees, sand bars) shall not be used in defining critical habitat.

-14-

50 C.F.R. § 424.12(c).  For the plover, the Service's definitive boundary definitions are the textual unit descriptions in the final rule.  AR 13392.  In many of these descriptions, the Service uses the river banks as boundaries.  Plaintiff asserts that these lines are ephemeral while the Service and Interveners contend they are not.

An agency's interpretation of its own regulation should be given *Auer* deference.  *See Auer v. Robbins*, 519 U.S. 452, 461, 137 L. Ed. 2d 79, 117 S. Ct. 905 (1997); *see also Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 65 S. Ct. 1215 (1945).  Under *Auer*, an agency interpretation of its own regulation controls unless "plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461 (citation omitted).  However, "*Auer* deference is warranted only when the language of the regulation is ambiguous." *Christensen v. Harris Cty.*, 529 U.S. 576, 588, 120 S. Ct. 1655 (2000).  Deference to the agency's position when the regulation is clear "would be to permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation." *Id.*

Here, FWS contends that the river banks described in the final rule are sufficient references.  They claim the banks are not ephemeral reference points because, though they may shift over time, they will always exist.  Plaintiff counters that moving boundaries are indeed ephemeral reference points, are not static or specific, and therefore cannot provide notice to

landowners, which plaintiff contends is the acknowledged purpose of the regulation.

There is some ambiguity in the regulation concerning what "ephemeral" includes.  To have this Court reject the FWS's use of river banks, plaintiff must show that the FWS's use of these lines is "plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461.  Plaintiff has not met this burden.  Webster's Ninth New Collegiate Dictionary defines "ephemeral" as "lasting one day only" or "lasting a very short time."  Based on this definition, "ephemeral" is unconcerned with whether the ephemeral thing moves or is fixed in place, but whether the thing exists for a long or short period of time.  Therefore, it is reasonable for FWS to include movable yet long-lasting lines, such as riverbanks.

Plaintiff's further argument, that textual descriptions are inherently inadequate, must fail.  Textual descriptions that name reference points and otherwise comport with the regulatory and statutory requirements are permissible.  That similar designations have at times delineated habitat by static coordinates does not render a textual description inadequate.

**D.   Economic Impact Analysis**

Economics must play a role in critical habitat designation.  "The Secretary shall designate critical habitat . . . on the basis of the best scientific data available and after taking into consideration the economic impact . . . of specifying any particular area as critical habitat.  16 U.S.C.

-16-

§ 1533(b)(2).  While economics must play a role, FWS has discretion to decide whether to exclude areas from a critical habitat designation.  "The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned."  *Id.*

Certain federal actions trigger consultations. Triggering actions are those "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2).  A FWS regulation defines "jeopardize" as "an action that reasonably would be expected . . . to reduce appreciably the likelihood of both the survival and recovery of a listed species." 50 C.F.R. § 402.02.  The same regulation defines "destruction or adverse modification" as an "alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." *Id.*

FWS concluded in its final rule that "a very small number of consultations would be due solely to designation of CH." AR 1998.  FWS also stated that "the vast majority of any future costs will be due to the listing and subsequent

consultation requirements, rather than designation of CH." AR 1998.

The primary concern raised by plaintiff is that FWS has failed to account for situations where an action may modify CH but does not jeopardize the plover. Plaintiff points to FWS's inappropriate designation of all Nebraska river CH as occupied as a fundamental flaw in their economic analysis. Overstating the amount of CH that is occupied necessarily leads to understating economic costs associated with CH designation because FWS asserts that any consultations on occupied CH is due to species listing rather than to CH designation. AR 1918. The Court has determined that FWS erred in treating all Nebraska river CH as occupied. Thus, FWS conclusion that all consultations are a result of listing is incorrect because it is based on an erroneous premise that all Nebraska river CH is occupied. Therefore, FWS's economic analysis understated the economic costs associated with CH designation because it incorrectly presumed that all costs are a result of listing of the species rather than as a result of CH designation.

FWS estimates that 950 informal consultations will be required regarding Nebraska river CH each year. AR 1964. These consultations are estimated to result in mitigation and project modification costs of between $764,000 and $2,984,000 annually. AR 1964. Yet, over ten years, FWS asserts that all of the anticipated costs of between $7.6 million and $29.8 million is due to listing rather than to CH designation. AR 1967.

-18-

FWS underestimates the economic costs of CH designation because it fails to treat a federal agricultural subsidy payment as a basis for a consultation.  AR 1944.  In *Sierra Club v. Glickman,* the Fifth Circuit Court of Appeals opined that crop subsidies provide a sufficient federal nexus as to require a consultation.  *Sierra Club v. Glickman*, 156 F.3d 606, 616 (5th Cir. 1998)("Given the plain language of the statute and its legislative history, we conclude that Congress intended to impose an affirmative duty on each federal agency to conserve each of the [listed] species . . . . In order to achieve this objective, the agencies must consult with FWS as to each of the listed species, not just undertake a generalized consultation").  Yet, FWS relies on opinions from the United States Department of Agriculture ("USDA") and from representatives of the Farm Service Agency ("FSA") in Nebraska that crop subsidy programs and CRP payments do not establish a sufficient federal nexus to trigger a consultation.  AR 1944.

FWS is required to create an impact statement that includes "probable economic and other impacts" that may result from "any significant activities" likely affected by the CH designation.  50 C.F.R. § 424.19.  In light of the clear language of 16 U.S.C. § 1536 (a)(2) and 50 C.F.R. § 424.19, FWS's reliance on the opinions of the USDA and FSA is misplaced.  In light of the Fifth Circuit's decision in *Sierra Club*, the cost of CH consultations by recipients of agricultural subsidies related to land located in and adjacent to CH must be included because of

-19-

the very real possibility of economic and other impacts on the subsidy recipients.  FWS has understated the economic and other impacts by its reliance on the USDA and FSA opinions.  Thus, the economic assessment prepared by FWS fails to meet the requirements of the ESA.

**E.   Failure to Consider Existing Management Plans**

Plaintiff's final argument asserts that FWS violated the ESA because it failed to exclude specific areas from CH designation on the basis that current management plans were in place and provided adequate protections for the piping plover. FWS delineated three requirements that a conservation plan must meet in order to qualify an area for exclusion from CH designation.  AR 1981.  First, the management plan must benefit the plover.  *Id.*  Second, the plan must contain implementation assurances.  Finally, the plan must include features to assure effectiveness.  Id.

In its attempt to consider and evaluate existing management plans, on January 3, 2001, FWS sent letters to states, tribes, federal agencies, non-governmental organizations and others involved with plover management in the northern Great Plains.  AR 1996.  Only CNPPID responded, expressing any interest in submitting its management plan for consideration and approval. AR 1996-97.

This Court may not consider whether a plan could have met the FWS three-part test if the plan has not previously been submitted to FWS for consideration.  *Downer v. United States*, 97

-20-

F.3d 999, 1005 (8th Cir. 1996)(a court need not consider
arguments a party failed to raise before the agency).  The
plaintiff asserts that FWS should have known of management plans
that were in existence and seeks to hold FWS responsible for
evaluating and considering all plans -- even those not formally
submitted.  The Court rejects this proposition.  Where plaintiff
failed to submit plans for consideration to FWS, this Court will
not consider whether or not a plan may have been sufficient to
allow for exclusion of specific areas from CH designation under
the ESA.

## IV.  Conclusion

        For the foregoing reasons, the parties' motions for
summary judgment (Filing Nos. 41, 47 and 49) will be granted in
part and denied in part.  The Critical Habitat Designation for
the Northern Great Plains Piping Plover, *67 Fed. Reg. 57,638*
(Sept. 11, 2002), but only insofar as it designates areas in
Nebraska and on the Missouri River adjacent to Nebraska, will be
vacated and remanded to the defendants for redesignation of CH so
as to include only areas occupied by the piping plover where
PCE's are found.  On remand, the Court directs FWS to complete a
proper economic assessment in accordance with the findings of the

Court.  A separate order will be entered this date in accordance with this memorandum opinion.

DATED this 13th day of October, 2005.

BY THE COURT:

/s/ Lyle E. Strom

_____
LYLE E. STROM, Senior Judge
United States District Court